We'll call the matter of Council Tree Investors Inc v. FC Cetal. Mr. Russell. Thank you. Good morning. I please the court. Kevin Russell on behalf of the petitioner of Council Tree Investors Inc. I'd like to reserve five minutes for rebuttal if I could. Great. Thank you. When the FCC announced that it was considering putting caps on the amount of bid credits offered to small businesses in spectrum auctions, Council Tree objected that doing so could drastically limit small businesses' abilities to bring new competition to entrenched incumbents in larger markets, which is where the majority of consumers live. The commission in the past decade or so has found that these entrenched incumbents now have taken a 98 percent share of the market and have all but run into extinction the regional carriers that as recently as 2003 served a third of the population. We pointed out that Congress expressly required the commission to seek to avoid that consequence by awarding licenses to small businesses as a means of avoiding license concentration and promoting competition. License concentration. Isn't that a problem for you the way it's written? Because, as I understand the crux of your argument, there's spectrum concentration. Ironically, spectrum concentration doesn't necessarily equate to license concentration because the small carriers are winning many licenses, but those licenses aren't adding up to much. That's true. I understand the point. If you think of license concentration as referring only in absolute terms of numbers of licenses, I take your point. Then we turn to the competition objective because that is a separate objective in the statute that the commission is required to pursue. When you're talking about license concentration, are you talking about the aggregate or are you talking about license concentration in various markets and how that may affect competition? I think we're talking about both. I think the commission might have some leeway on how to interpret the statute. It hasn't said in this order that we interpret it to mean only that we have to take care of competition on a small scale in regional places. In fact, having made this objection to the commission, the APA required it when it imposed the caps anyway, to go ahead and tell us whether it disagreed with our factual assessment of the caps effect, whether it agreed with us about the caps effect but nonetheless thought it was appropriate to impose the caps, or thought perhaps that the competition consequences were irrelevant as a matter of law. The principal problem with this order is you cannot tell in looking at it which of those things that the commission believed. Didn't they expressly take account of the continued opportunity to compete even in national markets in addressing in the order that even small businesses could continue to compete by bidding above the cap? The cap was simply going to put a limit and given the findings and extrapolation from them, a fairly de minimis limit in terms of the percentages of small businesses that this may even exclude from larger license bids. Let me unpack that a little bit and give you a couple of different answers. It is true that the commission made findings with respect to how many DEs would likely be affected by the caps. As we point out, that is not a rational way to measure competitive effect because it disregards the possibility, indeed the reality, that a small number of DEs are responsible for bringing the lion's share of competition to incumbents, particularly in the larger markets where consumers live. If you only ask does it take away a couple of DEs out of the equation, if those couple of DEs are responsible for acquiring the vast majority of licenses in the larger markets that bring real competition to bear on incumbents, that is a very different thing than if in fact it doesn't have that effect. Carrying the flag on behalf of the powerful few DEs in derogation of the interests of the many small DEs seems to be parallel to the evil you are seeking to avoid here. The commission hasn't found, and I don't think it could, that the caps are somehow protecting the smaller DEs. What it has done is it has relegated the DE program to simply being players in smaller rural and other less populated markets. You bring this back to Spectrum because they keep citing the numerosity of the DEs. That's sort of their answer for everything, right? Look at how many DEs won. And your response is, yeah, but they're winning peanuts, right? Right, and they're not bringing competition to bear in the larger markets where the consumers live. And if the commission thinks that that doesn't matter, that somehow they don't care about competition in larger markets, it's open to them to say so and to defend that, but they didn't. Instead they simply ignored the competitive effects. In other words, they haven't undertaken a rational analysis of the competitive effects, much less justify imposing this harm. You struck the records clear as to the negative effects on competition, but what data in the record supports the proposition that there is this negative effect? Well, we provided comments in the record, for example. We were at a bit of a disadvantage because the commission didn't propose any particular caps, but we responded to the ones that were proposed in the comments. And we showed, for example, that the cap proposed by AT&T, I think, would have eliminated something like 98% of the market value of the licenses available to DEs in the last major auction. The problem here, so I want to be clear, we're making two kinds of arguments here. One, we're making a procedural argument. It is a failure of the commission to consider an important aspect of the problem and give a reasoned explanation for its decision. And that doesn't have anything to do with what's in the record. And that problem, again, is the 98% concentration? That problem is that they haven't undertaken to evaluate the effect on competition of the caps, that the only thing that they did was evaluate the effect on the number of DEs, which is a lot of caps. But how can they know prospectively the effect on competition of these caps? They're coming up with these cap numbers to the best of their ability as a predictive matter, and they won't know until the dust clears at the end of the auction. We're not saying that they have to have perfect foresight. We're just saying they have to make an attempt, and they have to make a rational attempt. But why do they do that by extrapolating from the only data available? And haven't we said in our prior consultry opinion that if it is inherently speculative, if it is predictive, that's a circumstance where we are going to be especially deferential to the expertise of the agency. Sure, the problem here is that we're not complaining about the data that they looked at. We're complaining about the question they asked of that data. They asked how many DEs would be affected, and that's a perfectly reasonable thing to ask if all you care is about providing DEs a piece of the action, a chance to participate in the wireless market, which subsection 4d does require them to do. But if you're asking how do the caps affect competition, where the consumers live, you have to ask how do the caps affect the ability of DEs to acquire licenses in larger markets and bring competition to bear there. Where is the mandate in the statute that the competition in the market in question be a national one rather than a smaller one? Doesn't the legislative history actually suggest the opposite, that the House committee was recognizing that there was for large bids for national markets might not be appropriate for small businesses and that there were others at a smaller scale that may indeed be appropriate? Certainly the commission could have said that's our interpretation of the statute and defended it in this order. They didn't, in part because that's never been their position. We point out for many years they have encouraged large outside investors to make large investments to enable DEs to make large spectrum purchases, which enabled them to create big regional carriers that bring competition to where the people actually are. With $150 million in credits for this auction, that's a billion dollar bid. That's big, isn't it? That's a billion dollar bid for some. The vast majority is a $600 million cap. How do you know that a billion dollars or $600 million is too low? To be honest, we don't know from the commission because they never ask that question. If $150 million is too low in credits, what's enough? Is $250 million enough? In our view, there's no cap that is justified because the only purpose of any cap is to diminish competition and we don't think there's anything sufficient on the other side of the scale. They will get up and say, I think they've already written, wait a minute, if you have no cap, then you get right back to the problem they were seeking to avoid, which is the risk that a small operator will be the nominal party and you'll get hedge funds, venture capitalists, et cetera, that will glom onto them just simply for purposes of reaping these massive credits. Sure. So let me give you a response. That's kind of going to our substantive objection, our objection that there's not a basis in the record for any cap at all. But I don't want to lose sight of our principal procedural objection, which is they didn't undertake the appropriate analysis at all in this case. So our substantive objection is here the caps are not rationally tailored to dealing with that problem. The commission itself emphasizes that the caps have no effect at all on the incentive of the vast majority of DEs while leaving in place tens of millions of dollars for incentives of gamesmanship to them. The caps only affect those DEs who have investors who, if just so happens, are able to provide enough money to bring competition to the incumbents in the markets that they care about. And there's no finding that those kinds of DEs pose a special risk of this kind of gamesmanship. In fact, the order has never found any instances of that actually happening in the past. Your argument, I think, as you briefed it is the commission has at its disposal a panoply of other policing methods to prevent that from happening, right? May I just correct my answer? Yes. And I think the rejoinder, which I'd like you to address, is sure, we may have those at our disposal, but one really good way to police this is to not encourage investors of whatever organizational method to encourage them to participate by offering these lucrative credits. And I think I've already given you part of our answer to that, which is those caps are not rationally tailored to addressing that risk because they do nothing with respect to the incentives. For the vast majority of DEs, they leave in place tens of millions of dollars in those incentives. Well, they do something. They just limit it. It's a line-drawing exercise, is it not? It is a bit of a line-drawing exercise. If it is, then how should we, as a three-judge court, draw the line? Are we required in these matters to be deferential toward the commission? There's no doubt you're required to be deferential. At the same time, there's no doubt that you're required to ensure that they've drawn a rational line. And the only way you can do that is if they have engaged in a rational analysis in the order. If they have told you, how is it irrational? You stated a few minutes ago your belief that there shouldn't be caps at all, right? But we're dealing with the reality that there are, and you've conceded it is, in your words, I think, a bit of a line-drawing exercise. In drawing the line, the commission used auctions 66 and 73 as comparators, right? Correct. What was wrong with that? I mean, if not that, what else? So, again, a couple things. Those two auctions, they did not take into account, were conducted under rules that this court subsequently declared to be unlawful and dramatically suppressed DE performance. And so if they're going to use that as data points, it was incumbent on them to say whether they thought the level of DE participation and the competition that they brought to the market was an acceptable level, whether it was a good baseline, which they never did. They haven't responded in that regard. All right. So your attack is not upon the use of the auctions themselves, but rather the degree to which the commission explained and developed its use. That's right. They do have that objection to their using those two particular auctions. But a broader and more important objection is that they asked the wrong question of those past experiences. They did not ask how many consumers would be affected by the caps. If they shouldn't have used auction 66 and 73, what other data points should they have looked to? Well, we don't have an objection to them using the most recent, which is auction 97. But they need to take into account a couple things, and they need to ask the right question. They need to take into account that one of the reasons they've modified some other rules here is that they thought that the rules under which auction 97 were conducted were insufficiently supportive of DEs bringing competition to the market. But more importantly, again, they did not ask the question whether how much the caps, based on that auction data, would impede DEs' ability to acquire licenses in big markets or to put up a regional carrier. And we've said in our brief, for example, that in auction 97, a license in Philadelphia here cost in excess of $500 million, and that's just for one city and one license in one city. And so we made the argument that the effect of the caps is to provide competition to folks in places like Philadelphia and Mississippi, but to put the competitive benefits of the DE program for consumers in Philadelphia, Pennsylvania, off the table and out of reach. And the commission had an obligation to tell us if it thought that that was wrong as a factual matter, and it didn't. Thank you. We will have you back on rebuttal, Mr. Russell and Mr. Pasch. Good morning, Your Honor. My name is Craig Pasch. I'm counsel for the Federal Communications Commission. I think Mr. Russell has made clear Counsel Tree's position when he said that no cap is justified. He went on to clarify that as saying that no cap was justified in the record of this proceeding. But I think Counsel Tree's position is that there is no cap that could be justified, even though there's no statutory. That's what I thought I heard the first time. But that's in the face of the fact that there's clearly nothing in the statute that limits the commission's ability to impose a cap. We do need to find that there's a rational connection between the facts found and the choice that's been made by the agency. So addressing what your adversary has highlighted,  how is it that the caps rationally address that problem? Your Honor, I think the one thing that the commission was overall attempting to address in this order was the integrity of the auctions. That is, the integrity of maintaining a bidding credit for small businesses. We refer to the term designated entities, but these are small businesses. And the commission was concerned with ensuring that these credits went to businesses that were commensurate with the concept of a small business. And secondly, it was concerned with the integrity of the auction generally in limiting the incentives of ineligible entities to, as it said, gain the system, to create circumstances where they could participate in the auction and obtain these credits even though they might be ineligible. And the commission had good reason for concern because in auction 97, the largest auction in the commission's history in which more than $40 billion was collected, $13 billion was bid by two entities, both of whom claimed to be small businesses and claimed $3 billion of bidding credits. The commission, I think, was concerned that, evidently concerned because of the criticism that arose as a result of that auction, but this sort of activity was, even though it may or may not have been, it was certainly within the commission's rules in that auction in the sense that there was no cap. But the commission was concerned that this was risking the integrity of the auctions and of the bidding credit program generally. That concern may be a legitimate one, but what in the record, other than the commission's saying so, demonstrates that caps would prevent the problem? That is, unless they actually prevent the unjust enrichment, there's not the benefit to competition. The benefit to competition is presumed on the caps actually being effective in addressing the problem. What is the data in the record? What can we look to to see a rational connection between the caps and the problem that you've said you've identified? It certainly is a legitimate concern. Judge, I think I would give you two answers to that question. One is the commission's view was that the bidding credit cap would limit the incentive, as I said earlier, for larger entities to attempt to game the system and to obtain these credits. It's an additional, certainly the commission can take enforcement action afterwards, but this is an additional way to ensure that these bidding credits go to smaller entities. And the second one is the commission recognized that the caps would have an effect on competition. In paragraph 124 of the order, it acknowledges that in cities such as New York and Los Angeles, based on what it's seen in past auctions, it may be that, or even in Philadelphia perhaps, it may be that the cap would impose some limit on competition. But in the commission's view, the benefits of ensuring that the credits go to bona fide small businesses outweighed whatever impact there would be on competition. So your argument then is tantamount to saying that even if the commission's action results in continued oligopoly among the big four, that's okay as long as the DEs are truly small businesses rather than nominal entities funding for venture capitalists or hedge funds, et cetera? I think what the commission's view is, Your Honor, is it has a number of methods of attempting to address the problem of concentration in this market. The bidding credit cap is intended, as the statute says, to provide small businesses with an opportunity to participate in auctions. It has done that, and a lot of DEs are winning licenses. That's correct. But you can't deny, can you, that there's been remarkable consolidation and accretion of market power among the big four. No, and the commission is obviously concerned about that. So do you have a role there to play on behalf of the consumers? Is your answer that, well, we do have a role to play, and maybe we need to take measures against the big four, but that's a separate effort distinct from trying to make sure that a lot of small businesses actually win licenses in these auctions? Well, I would say I think what's clear from this order is the commission believed that there was a limited ability for the designated entity bidding credit to have an impact on competition in the major markets. I think that's what the commission was talking about when it said it recognized that the bidding credit cap would have an impact in the larger markets. But the commission also has a number of other tools to address the problems of concentration or to attempt to. For example, in the incentive auction, which has recently been essentially completed, the commission adopted a spectrum holding limitation, which limited national carriers' access to bid on a certain amount of spectrum in markets, which gave an opportunity for both smaller businesses and small businesses to bid on that spectrum. So the commission has other ways of addressing this, and the statutory duty the commission has with respect to small businesses is to ensure they have an opportunity to participate in the auctions to provide competition, and that's what it has done here. Well, not just participate, they have to win, right? If you have 300 DEs participate and none of them won licenses, you haven't fulfilled your statutory mandate, right? I think that's true, and that would be the case if the commission could not show that anybody was winning. But the fact is, as you can see from the data in the commission's order, a lot of designated entities won. They're winning a large number of licenses, but a remarkably small percentage of the spectrum. That's true. And is your answer that that's all the statute requires, that they win a number of licenses irrespective of how much spectrum that accounts for? I think the statutory language is an opportunity to participate, and if they're winning licenses, even if it's for small amounts of spectrum, these are licenses obviously these businesses have determined in their judgment and carrying out their business that these are the licenses that they can obtain and that they can provide competition, even if the competition is not in larger markets. The council tree is fixated on the larger markets and on the provision of spectrum value. Well, the statute by its terms isn't limited to promoting competition for small businesses in small markets. Pardon? I'm sorry? The statutory mandate in promoting competition isn't limited to providing small businesses with the opportunity to compete only in small markets. No. On its face, it would appear to apply to large markets as well. I think it applies to all markets. I don't disagree with that, but this issue came up in your discussion with Mr. Russell, is that there's nothing in the statutory cap that prohibits small businesses from competing in larger markets. If they hit the cap, they can continue to bid, and they have $150 million laid up on non-small businesses. Now, it's indisputable that that might not be enough in the very largest markets, but that nevertheless is a very significant advantage to small businesses, and if they can obtain financing to go beyond the cap, then I think it's fair for the commission to say that the cap has provided them with an opportunity to participate even in the largest markets. But if you're conceding that it's an exercise in futility to get the large markets to get licenses there, how does that satisfy your statutory mandate to avoid excessive concentration of licenses? Is your answer to that that, well, Philadelphia, New York, L.A. may be big markets, but there is only one license there or a couple of licenses there? I think the answer, again, I guess I'm repeating myself, is that the statute doesn't require the commission to ensure competition in every market. It requires the commission to provide small businesses an opportunity to compete in those markets in which they're able to compete, and it has done that by providing these credits for one, and to the extent that the cap imposes a limitation, the limitation is not on their ability to compete. The limitation is on their ability to compete in the very largest markets. Can you quantify that in terms of very largest markets? Are we talking three markets, six, 15? No. I assume you have something in mind. I don't have your expertise, so when you say the largest markets, that doesn't. Well, I would start with New York and L.A., but I don't know where we would stop when you're saying the largest markets. Well, the example Mr. Russell gave this morning of Philadelphia, I'm not sure where that comes in. It's probably not in the top five, but the license sold for $500 million. Philadelphia was $500 million? That's what Mr. Russell said this morning. It was $500 million in the auction 90s. I'm not sure which auction he was referring to. So that would be unaffected, or not negatively impacted then, DE and trying to bid on that license because you could bid up to a billion and get the full benefit of the $150 million credit? Right. At 15%, Mr. Russell says that they're really apparently his clients are only interested in the 25% level, so they could bid up to $600 million, which is still so. In fairness, I think the point he was making was that this would, in a particular, the spectrum cap is an aggregate, so that would mean they could only acquire, in any particular auction, they could only acquire the Philadelphia license. And there's just one license for Philadelphia? No, I think there's more than one license. Well, it depends on what's being auctioned. So in the current incentive auction, there would be more licenses, more than one license. It may be auctions in which there would not be. I think generally there would be more than one license. You make the argument that Counsel Tree waived the right to challenge the cap amounts because it didn't file a motion for reconsideration. It appears that Section 405A, the consideration position is only a condition proceeding to judicial review when a party seeking that review is not a party to the proceedings or relies on a question of fact or law on which the condition has not been afforded an opportunity to pass. Neither of those pertain here, and I wanted to clarify if you were still pressing that argument. Well, I don't think the Court needs to reach that argument, but, yes, we're still pressing it. And I think the second part of that is still present, in that Counsel Tree did not challenge the specific, either the $25 million floor or the $150 million cap in the incentive auction. It didn't challenge it because those specific numbers were not proposed in the notice of proposed rulemaking. They came only when the Commission adopted the report in order. But there's case law that makes clear that even if that's the case, even if the party had no reason to object to a proposal until the Commission's order came out, they're still obligated to file a petition for reconsideration before seeking review in court. Now, Mr. Russell's answer is, well, they objected to other particular limits that had been proposed in the comments, but those are not the limits the Commission adopted. So, yes, we are still pressing the 405 point. Thank you very much. No further questions? Thank you very much. Mr. Russell, we'll have you back on rebuttal. So the theme of the government's argument in the last few minutes has been that the Commission determined that the caps were necessary to keep DEs small, commensurate with their status as a small business. We think that that is not a proper interpretation of the statute, but more to the point, more to the procedural point, this represents a new interpretation of the statute by the Commission, which has for decades encouraged large outside investments by companies that enabled DEs to make competition out in the markets. The Commission never acknowledges that past history and never explains why it's changed its mind and suddenly thinks that small businesses ought to be understood as businesses that only are able to compete in small markets. And that's because the term small business in the statute has to be read in context, and the Commission has acknowledged this. In the context of an industry that requires hundreds of millions of dollars to buy a single license, that requires hundreds of millions of dollars more to build out a network in order to bring real competition to where the people are. And so the Commission has this long history of saying, no, we're not going to define who's a small business based on the amount of investment they're able to bring or the amount of competition they're able to bring, but instead by their gross revenues, and we're going to protect against large entities using them as fronts by making sure that the large entities don't exercise control over the spectrum or over the business of the DE. And the Commission still has those in place. And so we're in this odd position where the caps only apply to entities that the Commission has determined to be bona fide DEs, to be small businesses within the meaning of the statute. Nonetheless, they're making this argument that they're necessary in order to make sure that these DEs are somehow still small businesses, even though the Commission has determined necessarily that they are. And you've argued that that would prevent us from seeing the next metro PCS or LEAP. That's right. It's been in the Commission's policy. Let me press you on that a little bit. Maybe you could just educate me in the industry. I certainly appreciate how these caps would require a DE to start smaller than they have previously. But is it really true that a DE that might, let's say they put in a bid for a billion dollars and they win and they get $150 million in credits, can you give me a representative market where a bid of that magnitude would prevail? Well, so there's an example in the amicus brief in this case that talks about the Denali experience that Council 3 was involved in, in which they established a small regional carrier around Chicago. And that costs more than in today's spectrum costs. To replicate would cost more than $2 billion to acquire and bust the cap. Can you give me one for a billion? I mean, is there a... What you can get for a billion dollars? Yeah. Well, you can get a lot of small markets in terms of... I'm just trying to have this discussion with you not entirely in the abstract. It should be mostly in the abstract. But if you could contextualize it a little bit, it would be helpful. I'm not going to hold you to it. Sure, sure. I mean, you know, the spectrum prices for mid-sized cities can run, you know, 90, 100 million dollars. And so there are... The effect of the caps is to put some very big single licenses out of reach and to put a larger number of regional potential competitors out of reach. Sure. All right. So let's say, all right, let's say Tucson. Let's say you can get Tucson for a billion dollars. What's to prevent that small business designated entity from getting a Tucson license and then, you know, expanding into Las Cruces and, you know, maybe even getting into Phoenix or San Diego? Is there anything to prevent that from happening over a 10- or 20-year period? Sure. There's a discussion of this in the comments. There's a discussion of this in the amicus brief. And the basic problem is in order to operate effectively, you have to have sufficient scale to spread out the cost, your fixed cost of putting up the cell towers, hiring all the people, among a sufficient number of customers to make it work. It just doesn't work anymore to have a small ma and pa carrier except in the smallest of markets. And so I'd like to stress that this is a conversation. I don't know how you can say that because if it just doesn't work, what you're saying is the 112 or I forget the exact number of DEs that actually won licenses, you're saying they've all made bids that are doomed to failure? They're not going to make any money?  All right. So if you're making money in small markets, what's to prevent a good entrepreneur from growing that business over time? Is there something to prevent that? Or are you just saying it's not realistic to expect that to happen? Well, I think what prevents that is once you run up into wanting to expand your market into Tulsa or other things, you need the economies of scale to make that work. I will say I would like to stress there's a discussion of this in the comments. There's nothing of the sort in the order. And that's our principal objection, that the commission here did not undertake a legitimate, reasoned analysis. It puts your objection as a procedural argument. I think that we have the other objection, gotten some headwinds about that. But I do think our easier and more clearly right objection is the procedural one, that they simply didn't consider the caps. But the order does expressly reference the Small Business Association rules that cap the sole source awards and explain that they're doing so for the very reasons that Judge Harden was just articulating. As those are addressed in the order, why isn't that drawing into disorder the commission's same rationale? Why can't we infer that the commission had the same concerns, that is that a small business would have the opportunity to grow, to make profits, to expand. And when we're talking about the allocation of public subsidies, that's exactly how the commission wants it to work. Okay. Two responses to that, if I could. First, the commission made no attempt to expand that kind of general analogy to this particular market, which is very different, where the barriers to entry are enormous and it takes hundreds of billions of dollars to get started. Second, the purpose of the SBA is to provide just generalized economic opportunity. It is the equivalent of the 4D obligation under this statute, which is to participate in the market generally. It is not set up to create competition and to avoid license concentration of the sort that Congress was concerned about in this specific statute. And that's why, for example, the SBA itself filed comments in this proceeding opposing the caps. Thank you very much. Thank you. And thank you to both of the counsel for your very helpful arguments. We'll take the matter under advisement and we'll ask the court to recess the proceeding.